UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

CRYSTAL LYNN CRAFT,           )
                              )
          Plaintiff,          )
                              )
     v.                       )   Case No.  4:12CV248 FRB
                              )
CAROLYN W. COLVIN,[1] Commissioner )
of Social Security,           )
                              )
          Defendant.          )

**MEMORANDUM AND ORDER**

This matter is before the Court on plaintiff Crystal Lynn Craft's appeal of an adverse decision of the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.    Background and Procedural History**

Plaintiff applied for Disability Insurance Benefits ("DIB") pursuant to Title II, and Supplemental Security Income pursuant to Title XVI, of the Social Security Act, 42 U.S.C. §§ 401, et seq. (also "Act"), alleging that she became disabled on October 23, 2008. (Administrative Transcript ("Tr.") at 17, 193-99). Plaintiff's applications were denied, and she requested a

_____

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should therefore be substituted for Michael J. Astrue as the defendant in this case. No further action needs to be taken to continue this suit by reason of the last sentence of 42 U.S.C. § 405(g).

- 1 -

hearing before an administrative law judge ("ALJ"), which was held on August 5, 2010. (Tr. 1508-1566). On November 3, 2010, the ALJ issued an unfavorable decision. (Tr. 14-24). Plaintiff sought review from defendant agency's Appeals Council, which denied her request for review. (Tr. 5-13). The ALJ's November 3, 2010 decision thus stands as the Commissioner's final decision subject to review in this Court. 42 U.S.C. § 405(g).

## II.  Evidence Before The ALJ

A.  <u>Plaintiff's Testimony</u>

Plaintiff first responded to questions posed by the ALJ. Plaintiff testified that she was five feet, five inches tall and weighed 180 pounds, which represented a 60-pound weight gain. (Tr. 1516). Plaintiff testified that doctors did not know why she had gained so much weight. (<u>Id.</u>) She testified that she was divorced and had no children. (Tr. 1517). She stated that she had lived in a trailer, but was evicted the previous evening. (<u>Id.</u>) When asked to explain, plaintiff testified "[w]ell we got in a fight and he threw a beer bottle at e [sic] and the cops came and it's his place so they kicked me out so I slept in my car." (<u>Id.</u>) She had a valid driver's license and drove once per week, and had driven herself to the administrative hearing. (Tr. 1518). She attended college but did not obtain a degree, explaining that she dropped out because her brother was killed in a car accident. (Tr. 1519). She testified that she also dropped out of "Sanford Brown." (Tr. 1531). She was, however, licensed in cosmetology. (Tr. 1528).

The ALJ asked plaintiff whether she had worked since

- 2 -

October of 2007, and plaintiff's attorney stated: "If you don't remember just say [INAUDIBLE]." (Tr. 1519). Plaintiff testified that she did not remember. (Id.)

Plaintiff testified that she had applied for unemployment compensation benefits, and was turned down because she quit her job. (Tr. 1520). Plaintiff received food stamps and Medicaid, and stated that she had received Medicaid since 2006. (Tr. 1521).

The ALJ told plaintiff that there was evidence that she had worked in 2009 at a company located in Farmington, Missouri, but plaintiff testified that she could not recall such employment. (Tr. 1522-23). She testified that her past employment included work at Pasta House, at Ryan's Restaurant as a server, and at McDonald's. (Tr. 1523-24). She testified that she left Ryan's because her back hurt, and left McDonald's because she had to have a thoracotomy and was not permitted the necessary time off. (Tr. 1524-25).

In 2005 and 2006 she worked for a salon as a hairstylist, and left this job because of back pain. (Tr. 1526-27). In 2003 through part of 2005 she worked for the State of Missouri as a corrections officer responsible for custody and control of male inmates, a job that required her to break up fights and deal with unruly prisoners. (Tr. 1528). When asked why she left this job, plaintiff testified: "I got divorced for the second time and he was there for like two months longer than I was so one of us had to go per the captain's orders." (Id.) In 2003, plaintiff worked for Macy's selling purses, and also worked as a cocktail waitress, a

- 3 -

job she left after obtaining a cosmetology license and beginning work as a hairstylist. (Tr. 1529-1530). Plaintiff's past work also included jobs as a teacher's helper at a day care center, a telemarketer, a pricing coordinator for Pepsi Mid-America, a temporary service employee, a cashier at Goody's Family Clothing, a server at Ruby Tuesday's, a car-hop at Sonic Drive-In, a ticket agent at an AMC Theater, and a worker at Long John Silver's. (Tr. 1533-38). Plaintiff testified that Long John Silver's was her first job and that she had lied about her age to get it (she was only 15 years of age). (Tr. 1538).

Plaintiff testified that she was incarcerated for seven months in 2007 for "[b]ad checks and forgery." (Tr. 1526).

Plaintiff testified that she could not do any of her prior work on a full-time basis "[b]ecause it hurts too bad and I'm constantly, I mean I have to take naps constantly because of all this medicine I'm on I'm exhausted." (Tr. 1538-39). When asked where it hurt, plaintiff testified "[i]t's mostly my back, my spine, the right side of my neck, the left side of my back, it goes around underneath my ribcage on the left hand side, as far as the back pain goes. Then I have fibromyalgia which is like my hands, my knees, my ankles. And then I have osteoarthritis in my knees and my hands." (Tr. 1539).

Plaintiff then responded to questions from her attorney. Plaintiff testified that she had been undergoing treatment for mental illness for the past eight months. (Tr. 1540). She testified that she felt tired all day, and napped twice per day.

- 4 -

(Tr. 1540-41).  She took medicine to sleep at night and also used a CPAP machine, but testified that the machine did not help her daytime sleepiness.  (Tr. 1541-42).  She testified that she had suicidal thoughts daily, but "would never do anything because of my, I'm not going to go to hell because I kill myself."  (Tr. 1543).

She testified that she had been married and divorced three times.  (Id.)  She testified that her first husband was physically abusive and her second and third husbands were alcoholics, "[a]nd there was like physical and mental abuse in all three."  (Id.)  Plaintiff testified that the man involved in the fight she described at the beginning of the hearing was her boyfriend, and that she had been "laying on the couch and because I can't pay the bills because I'm not working he told me I was inconsiderate and worthless and he just got mad and he had a beer bottle in his hand and threw the beer bottle at me and it hit me in the leg.  So I went outside and called the police, while it's his house, so they kicked me out."  (Tr. 1544).

Plaintiff testified that she had a problem with her temper, and that her temper came out when someone yelled at her or made her feel closed in.  (Id.)  She testified that she had bipolar disorder and had good days and bad days.  (Tr. 1545).  She described a good day as one in which she was happy and felt like doing the dishes, cleaning house and getting things done, and testified that she had good days less than one day per week.  (Id.)  She described a bad day as one in which she wanted to sleep all the

- 5 -

time, did not feel good, wanted to be left alone, and wanted to lay in bed and cry.  (Tr. 1546).

Plaintiff testified that she underwent thoracotomy to remove a mass, and suffered from post-thoracotomy syndrome.  (Id.) When asked to explain, plaintiff stated: "[i]t causes me where it just hurts all the time.  I can't, I can't move, I can't stand very long, I can't sit very long."  (Tr. 1547).  Plaintiff also testified that she felt like she was suffocating and that it hurt to breathe.  (Id.)

Plaintiff also testified that she had three bulging discs in her neck and back, and had epidural injections every two weeks. (Tr. 1548).  She stated that she could sit for 15 to 20 minutes before she needed to move.  (Tr. 1529).  When asked how long she could stand, she replied: "[o]h five minutes tops and I'm crying." (Id.)  She testified that she could lift less than five pounds, but when her attorney asked her whether she could lift a gallon of milk, she replied that she could.  (Tr. 1549-50).  Her attorney told her that that was about eight pounds, and asked plaintiff whether she could lift two gallons of milk, and plaintiff replied that she could not.  (Tr. 1550).  Plaintiff testified that, if she woke at 10:00 a.m., she would stay awake until 1:00 or 2:00 p.m. before taking a three-hour nap.  (Tr. 1551).

Plaintiff testified that she suffered from fibromyalgia and had tingling in her hands, knees and ankles.  (Tr. 1551-52). She was then asked whether she had pain, and she testified that she had burning pain every day.  (Tr. 1552).  She testified that she

took morphine and dilaudid for thoracotomy pain, but the medicine helped with everything.  (Id.)  She testified that all of her medications caused tiredness.  (Id.)  She testified that she told her doctors about the tiredness, but they told her that the only way to avoid the tiredness was to stop taking the medications, and that was "not possible." (Tr. 1553).  The ALJ then heard testimony from a vocational expert.  (Tr. 1553-65).

B. <u>Medical Records</u>[2]

On April 7, 2008, plaintiff was seen at the Madison Medical Center Rural Health Clinic by Melinda Fischer, a Family Nurse Practitioner.  (Tr. 1195-96).  Plaintiff reported that she wanted to establish care, and needed medication refills.  (Tr. 1195).  Plaintiff reported a history of lower back pain with some radiation into her lower hips and had x-rays done after a fall from a horse, but was unable to have follow-up care.  (Id.)  Upon examination, Nurse Fischer noted that plaintiff was alert and oriented, obese, and in no acute distress.  (Id.)  It is noted that plaintiff reported "that she just needs overall refills on her medications." (Id.)  Her neck was supple, there were no findings relative to her extremities.  (Tr. 1195).  Nurse Fischer advised

---

[2]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council.  This evidence consists of progress notes from Dr. Quadri's office dated December 7, 2010 and January 4, 2011.  (Tr. 13).  The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence.  <u>Frankl v. Shalala</u>, 47 F.3d 935, 939 (8th Cir. 1995); <u>Richmond v. Shalala</u>, 23 F.3d 1441, 1444 (8th Cir. 1994).  For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of her decision.

plaintiff to have laboratory testing. (Id.)  Plaintiff refused follow up care related to her history of back pain. (Id.)

Records from Community Counseling Center indicate that plaintiff was seen on April 16, 2008 with complaints of anxiety and low mood. (Tr. 1200).  Plaintiff reported that her medication caused over-sedation. (Id.)  She denied self-harm. (Id.) Plaintiff was given an increased dosage of an antidepressant and medicine for sleep, was counseled regarding ways to deal with anxiety, and told to return in four weeks. (Id.)

On April 21, 2008, plaintiff returned to the Madison Medical Center Rural Health Clinic for follow up, stating that she was there for review of laboratory testing. (Tr. 1193).  She also wanted to discuss getting back on her medications for chronic allergies and asthma. (Id.)  Upon examination, she was alert, oriented and obese, and in no acute distress. (Id.)  Her current complaints were noted as allergy symptoms and asthma. (Id.) Examination was normal, and plaintiff was advised to return on an as-needed basis. (Tr. 1193-94).

On May 14, 2008, plaintiff returned to Community Counseling Center and reported continued anxiety and worry that she would be denied Medicaid. (Tr. 1201).  Plaintiff stated that she could not afford counseling. (Id.)  On her next visit, she complained of increased crying spells, decreased sleep, and increased rejection sensitivity. (Tr. 1202).  She reported that she had been denied Medicaid. (Id.)  She denied self harm, and stated that her medication was not helping her sleep. (Id.)  She

- 8 -

was given Abilify[3] and Lunesta.[4]  (Id.)

On July 22, 2008, plaintiff saw Steven Mellies, D.O., for a consultative evaluation due to seizures that began five to six years ago following a fall from a horse.  (Tr. 1169-70).  Plaintiff reported that her seizures were witnessed by her former husband, and by her former cell mates during what Dr. Mellies described as a two-year incarceration.  (Tr. 1169).  Plaintiff reported taking Depakote,[5] and stated that it caused quite a bit of weight gain. (Id.)  Dr. Mellies wrote: "[a]lso more recently there has been some question as to whether she truly has bipolar disease.  She said that even one psychiatrist mentioned split personality."  (Id.) Plaintiff reported that she was anemic and had asthma, endometriosis, hypothyroidism, migraine headaches, and pain that could radiate up and down her spine but not into the extremities except occasionally her thighs became numb.  (Id.)  Plaintiff "noted that that [sic] if she pops her back it all goes away." (Tr. 1169).  Physical examination was normal, and neurological examination was normal, including a normal mental status.  (Tr. 1169-70).  Dr. Mellies's impression was generalized seizures which

---

[3]Abilify is used to treat several conditions, and is also used with an antidepressant to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html

[4]Lunesta is used to treat insomnia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605009.html

[5]Depakote, or Valproic Acid, is used alone or in combination with other drugs to treat certain types of seizures, and to treat episodes of mania in patients with bipolar disorder.  It is also used to prevent the onset of migraine headaches. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682412.html

were nocturnal, and he ordered an MRI and EEG and changed Depakote to Zonisamide.[6] (Tr. 1170).  MRI of plaintiff's brain performed on July 30, 2008 was normal.  (Tr. 718).

Records from Robert Duddy, M.D., indicate that plaintiff was seen on a few occasions from March 16, 2007 to December 2, 2008 for complaints of foot and ankle pain.  (Tr. 1162-68).

Records from Midwest Orthopedic Group indicate that plaintiff was seen on September 22, 2008 with complaints of bilateral knee pain.  (Tr. 1159-61).  X-ray of the bilateral knees was normal.  (Tr. 1161).  Plaintiff was treated with an injection.  (Tr. 1160).

On August 29, 2008, plaintiff returned to Community Counseling Center and reported that she had been taking double the prescribed dose of Abilify, and felt it worked better.  (Tr. 1203).  She reported being irritable, and asked about taking a different medication.  (Id.)  She stated that she did not have time for counseling because she worked seven days per week to support herself and her mother and grandmother.  (Id.)  She stated that she had no time to relax.  (Id.)

On August 7, 2008, plaintiff saw Nurse Fischer for follow-up care regarding her knees.  (Tr. 1157).  An August 12, 2008 MRI of plaintiff's bilateral knees revealed some joint swelling, but was otherwise negative.  (Tr. 1124).  An August 13, 2008 x-ray of plaintiff's cervical spine revealed loss of lordosis,

---

[6]Zonisamide is an anticonvulsant used to control seizures. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603008.html

but was otherwise negative.  (Tr. 1125).

Plaintiff returned to Nurse Fischer on August 21, 2008 for follow-up and review of radiological results.  (Tr. 1156).  An August 26, 2008 MRI of plaintiff's thoracic spine revealed a cystic mass at the level of the T5 vertebra, (Tr. 1122), and an MRI of plaintiff's lumbar spine performed on that date revealed broad-base disc bulge changes at the L5/S1 area.  (Tr. 1121).

On September 18, 2008, plaintiff saw Murali Macherla, M.D. with complaints of left-sided mid back pain that she attributed to falling from a horse in 1998.  (Tr. 754).  Dr. Macherla ordered a CT scan and, after plaintiff told him she had run out of pain medication, prescribed Percocet.[7]  (Tr. 755).  She returned on October 2, 2008 for review of the CT scan, which showed a possible neurogenic tumor, and it was recommended that the mass be surgically removed.  (Tr. 756).  Plaintiff was admitted to Southeast Missouri Hospital with a preoperative diagnosis of a thoracic cystic mass, and underwent thoracoscopy with excision of the mass on October 14, 2008.  (Tr. 753, 757, 893-94).  Plaintiff had no postoperative complications, and she was discharged on October 16, 2008 to home in satisfactory condition.  (Tr. 982). The final pathology report showed that the mass was benign, and the post-operative diagnosis was listed as simple lymphatic cyst.  (Tr. 895).

---

[7]Percocet, or Acetaminophen with Oxycodone, is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a601007.html

On October 1, 2008, plaintiff returned to Community Counseling Center and reported "doing ok" psychologically. (Tr. 1204).  She reported that she injured a tendon in her right foot, and that she had a spot on her lung. (Id.)  She reported that her sleep and appetite were good. (Id.)  She was given samples of medication and told to return in three months. (Id.)

Plaintiff returned to Nurse Fischer on October 9, 2008 for complaints related to a urinary tract infection. (Tr. 1155).  She returned on October 20, 2008 for stitch removal related to a chest tube. (Tr. 1154).  She returned on November 10, 2008 with complaints related to vaginitis, (Tr. 1152), and on December 1, 2008 for complaints of pain related to surgery. (Tr. 1153).  Chest x-ray performed on this date was negative. (Tr. 1120).

On January 20, 2009, plaintiff returned to Community Counseling Center and reported that she was ok psychologically, but was very tired. (Tr. 1205).  She reported a lung/back mass, and stated that her foot had healed and she had been back at work for the past two weeks. (Id.)  She reported that her mood was ok. (Id.)  Lunesta was discontinued because of plaintiff's reports of tiredness, and she was advised to return in three months. (Id.)

On March 30, 2010, plaintiff presented to Crider Health Center and saw psychiatrist Omar Quadri, M.D., for an initial psychiatric assessment, stating that she was transferring care because she had relocated to pursue her current boyfriend. (Tr. 748).  She reported that she had been divorced three times. (Id.)  She reported that she was always depressed and tired. (Id.)  Dr.

Quadri wrote that plaintiff met the criteria for borderline personality disorder and bipolar II disorder. (Id.) Plaintiff reported that, as young as nine years of age, she craved attention and cut herself when she did not get it. (Tr. 748). She reported chronic intermittent suicidal thoughts but never attempted due to religious beliefs. (Id.) She feared loneliness and abandonment, and stayed in multiple abusive relationships because she preferred being in a relationship to being alone. (Id.) She made frantic efforts to avoid abandonment, and went to prison for writing bad checks to the tune of $600,000.00 for her boyfriend who was in the mafia, stating that she was afraid of him. (Id.) She reported impulsiveness and extreme temper "for as long as I can remember." (Tr. 748). She reported sexual abuse between the ages of 9 and 13. (Id.) She reported crying a lot, lack of energy, poor motivation and not wanting to do anything, and that she always had chronic insomnia. (Id.) She was on parole until 2010 after spending 18 months in prison. (Tr. 749). She told Dr. Quadri that she had fibromyalgia, cancer of the spine in remission, COPD, obstructive sleep apnea and C-PAP use, asthma, hypothyroidism, borderline diabetes type II, and stomach ulcers. (Id.) She attributed her depression to her brother's sudden death when she was 18. (Id.) Upon mental status examination, Dr. Quadri noted that plaintiff was casually dressed, polite and cooperative with good eye contact, sad, depressed, and anxious. Her responses were logical and goal directed, she denied suicidal thoughts, intent, plan and urges, had no thought disorder, had good insight and judgment, and clear

sensorium.   (Id.)   Dr. Quadri diagnosed bipolar disorder, borderline personality disorder, fibromyalgia, cancer of the spine in remission, COPD, obstructive sleep apnea with C-Pap use, asthma, hypothyroidism, borderline type II diabetes, hypertension, stomach ulcers, and seizure disorder, and he assessed a Global Assessment of Functioning ("GAF")[8] of 65.   (Tr. 749).   Plaintiff was advised to seek Provigil[9] for excessive daytime tiredness.   (Id.)

On April 15, 2009, plaintiff returned to Community Counseling Center and reported that she got married last month and relocated, and was happy.   (Tr. 1206).   She reported working at "Ryan's."   (Id.)   She reported "some back pain," good mood, sleep and appetite, good energy, concentration, and motivation, but later reported difficulty getting restful sleep without Lunesta.   (Id.)

On May 4, 2009, plaintiff saw Nurse Fischer, who noted plaintiff's current complaints as "back hurts - to breathe, yawn, ear [infection in both ears]."   (Tr. 1151).

A May 19, 2009 MRI of plaintiff's cervical spine revealed

---

[8]The GAF score is the clinician's judgment of the individual's overall level of functioning. See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000). GAF scores of 41 to 50 represent serious symptoms or impairment in social, occupational or school functioning; scores of 51 to 60 represent moderate symptoms or difficulty in those areas; and scores of 61 to 70 represent mild symptoms with a reasonably good level of functioning. (Id.)

[9]Provigil, or Modafinil, is used to treat excessive sleepiness caused by narcolepsy (a condition that causes excessive daytime sleepiness) or shift work sleep disorder (sleepiness during scheduled waking hours and difficulty falling asleep or staying asleep during scheduled sleeping hours in people who work at night or on rotating shifts). http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a602016.html

disc arthritic bulge at C3/4, 4/5, and 5/6.  (Tr. 1119).  A July 17, 2008 x-ray of plaintiff's bilateral knees was negative.  (Tr. 1127).  A July 30, 2008 EEG was normal.  (Tr. 1126).

On June 15, 2009, plaintiff was seen at Greater St. Louis Neurosurgical Specialists with complaints of pain in her neck and back, numbness in both arms and legs, and pain in her left breast. (Tr. 1115).  Plaintiff reported that these symptoms began in 2001 and were constant, and reported that she had been "bucked off of a horse." (Id.)  Plaintiff reported that she smoked less than one pack of cigarettes per day. (Id.)  Upon examination, there was no misalignment or tenderness, there was full range of motion, normal stability, strength, tone and sensation in the left lower extremity, negative straight leg raise testing, normal head and neck with satisfactory range of motion, and adequate strength with normal stability. (Id.)  Plaintiff's lumbar MRI scan was reviewed, and it was opined that it revealed moderate degenerative changes at L2-3, L3-4, L4-5, and L5-S1.  (Tr. 1115).  It was noted that plaintiff's cervical radiological testing showed straightening of the lordotic curve.  (Id.)  Plaintiff "was advised that it was imperative to stop smoking," and an inversion table was recommended. (Tr. 1116).  Plaintiff was given Voltaren.[10]  (Id.)

On July 30, 2009, Single Decisionmaker Christine Mathews completed a Physical Residual Functional Capacity Assessment.  (Tr.

_____

[10]Voltaren (Diclofenac) is an NSAID that is used to relieve pain, swelling, tenderness, and stiffness. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689002.html

1108-14).  Ms. Mathews opined that plaintiff could lift and carry
20 pounds occasionally and 10 pounds frequently; stand and/or walk
and sit for six hours in an eight-hour work day, and push and pull
without limitation.  (Tr. 1109).  Ms. Mathews opined that plaintiff
could occasionally climb, balance, and stoop, and could frequently
perform all other postural maneuvers.  (Tr. 1110).

     Also on July 30, 2009, James Morgan, Ph.D. completed a
Psychiatric Review Technique form.  (Tr. 1096-1107).  Dr. Morgan
opined that plaintiff's impairment(s) were not severe, but that
plaintiff did have "borderline personality traits."  (Tr. 1096,
1101).  Dr. Morgan opined that plaintiff had mild restriction of
activities of daily living, mild difficulties maintaining social
functioning and maintaining concentration, persistence or pace, and
no repeated episodes of decompensation.  (Tr. 1104).

     On November 23, 2009, plaintiff saw Vera Lynskey, M.D. to
establish care, and reported complaints of eye twitching and a
recent seizure.  (Tr. 481).  She reported that she had "not seen
her psychiatrist in a while who had been treating her for
depression, anxiety and possibly bipolar" disorder.  (Id.)  She had
also not followed up regarding other conditions.  (Id.)  Upon
examination, plaintiff had no skeletal tenderness, no joint
deformity, and no swelling.  (Tr. 483).  She was not anxious, did
not have obsessive thoughts, had normal insight and judgment, had
normal attention span and concentration, and had no suicidal
ideation.  (Id.)

     On November 29, 2009, plaintiff visited Barnes-Jewish St.

- 16 -

Peters Hospital with complaints of abdominal pain, vomiting, migraine headache, sore throat, and night sweats. (Tr. 529, 558). She reported a history of gastroesophageal reflux disease ("GERD"), and reported that she had been having increased nausea and vomiting, and had recently noticed dark black stools. (Tr. 560). She reported smoking one-half of one pack of cigarettes daily, and occasionally drinking alcohol. (Tr. 561, 564). Upon examination, she was noted to be in no acute distress, and was described as lying comfortably in bed. (Id.) She had full range of motion of her extremities with no edema. (Tr. 561, 564, 567). (Id.) Plaintiff was admitted, and testing revealed a kidney stone, and ulcers and erosions in the distal esophagus, stomach, and duodenum. (Id.) Plaintiff was admitted and treated with medication, IV fluids, and a clear liquid diet, and her symptoms improved. (Tr. 558, 563). CT of the abdomen and pelvis was normal. (Id.) Hemoglobin levels remained stable throughout hospitalization, and plaintiff had no further active bleeding. (Id.) When discharged on December 1, 2009, plaintiff had minimal pain, and was stable. (Id.) She was advised to be active as tolerated, follow a regular diet, and follow up with Dr. Nissing in two weeks. (Tr. 558).

On December 3, 2009, plaintiff complained of abdominal pain, and a sonogram revealed a gallstone. (Tr. 588).

Also in December of 2009, plaintiff complained of post-thoracotomy pain and neck pain, and x-ray of plaintiff's thoracic spine revealed minimal degenerative disc disease of the mid thoracic spine. (Tr. 591). X-ray of the cervical spine revealed

- 17 -

"straightening of the cervical spine, otherwise negative cervical spine." (Tr. 592). MRI of the cervical spine performed on December 11, 2009 revealed mild degenerative disc disease most notably at C4-5 with resultant disc bulge and thecal sac effacement without complicating process. (Tr. 595). MRI of the thoracic spine performed on this date revealed mild multilevel degenerative disc disease, a disc protrusion at T8-9 with no stenosis or impingement, and was otherwise unremarkable. (Tr. 595-96).

On December 4, 2009, plaintiff returned to Dr. Lynskey with complaints of a migraine and back pain, but denied vomiting, abdominal pain, diarrhea, and constipation. (Tr. 477). She reported that the migraine was the same as it had been since her childhood, and the back pain were the same as in the past. (Id.) She had no joint symptoms or neck stiffness. (Tr. 478). She was tender over her spine and had muscle spasm, but normal flexion, extension, and rotation. (Tr. 479). She had no cervical, thoracic or lumbar spine tenderness, and had normal mobility and curvature in all three areas. (Id.) Her extremities were normal. (Id.) Neurological examination was normal, and she had no unusual anxiety or evidence of depression. (Tr. 479-80). She returned on December 9 with complaints of a cough. (Tr. 473).

On December 14, 2009, plaintiff returned on Barnes-Jewish St. Peters Hospital with continued complaints of abdominal pain and vomiting. (Tr. 600). Plaintiff ultimately underwent surgical removal of her gallbladder. (Tr. 629-30). She returned on January 28, 2010 with complaints related to a gastric ulcer. (Tr. 635).

- 18 -

On February 2, 2010, plaintiff returned to Dr. Lynskey with complaints of a bump on her lip, back pain, vomiting, and mental problems. (Tr. 469). She reported that she had not taken psychiatric medications for three to four weeks. (Id.) She denied suicidal ideation. (Id.) Her medications were refilled. (Tr. 472). She returned on February 16, 2010 with complaints of fatigue, and Dr. Lynskey referred her for a sleep study. (Tr. 465-68).

On February 25, 2010, plaintiff presented to Barnes-Jewish St. Peters Hospital for a sleep study. (Tr. 642). Plaintiff complained of feeling sleepy all day and having apnea, and stated that she had these symptoms for the past seven to eight years. (Id.) Plaintiff reported that she went to bed between midnight and 2:00 a.m.. (Id.) On weekdays, she got up at 6:00 a.m., but on weekends she slept until 11:00 a.m. (Id.) She reported that she woke three or four times during the night, and took a nap seven days per week. (Tr. 642). She reported smoking one and one-half packs of cigarettes per day, and consuming two to three colas per day. (Id.) Plaintiff reported that she was a very restless sleeper, a light sleeper, and that she woke in the middle of the night to use the bathroom and to get a snack or a drink, and stated that she took sleeping pills. (Id.) Plaintiff reported that she was so sleepy during the day that her work was poor. (Id.) She reported that she frequently did not feel sleepy at her bedtime, and that she functioned best in the evening. (Tr. 642). She was diagnosed with mild complex sleep apnea, moderately severe

sleep hypoxemia (low levels of oxygen in the blood), severe pathologic sleepiness, early REM onset, obesity, and severe cigarette abuse. (Tr. 643). Use of a bi-level positive airway pressure device ("BIPAP") was indicated, and plaintiff was instructed to stop smoking. (Id.) A second sleep study performed on March 13, 2010 revealed excellent response to the BIPAP, and it was noted that plaintiff should pursue daily exercise, and that her medications may play a role in the degree of her hypoxemia. (Tr. 653). Plaintiff returned in March of 2010 and was observed to have borderline diabetes, and was instructed to follow a meal plan and start an exercise program. (Tr. 655-56). She also had an ear infection. (Tr. 676).

On March 2, 2010, plaintiff returned to Dr. Lynskey "with paperwork for school" to get a medical leave of absence due to trouble concentrating. (Tr. 460). She expressed frustration because she continued to gain weight despite watching her diet and walking for 20 minutes per day, but then admitted to eating fast food. (Id.) Dr. Lynskey prescribed Lunesta, but "reinforced importance of adequate sleep hygiene with quiet, non-stimulating environment, no TV [one hour] before bedtime, no smoking [three hours] before bedtime, etc." (Tr. 463). She advised plaintiff to stop smoking because it had a negative affect on her blood pressure, sleep, and behavioral issues, and noted that plaintiff was "contemplating" this. (Id.) She returned on March 9 with "personal problems" due to exposure to a high risk behavior person. (Tr. 456). She returned on March 23, 2010 with complaints of

withdrawal due to a prescription change and sleepiness, and requested withdrawal medication. (Tr. 452). She returned on April 15 for review of laboratory testing. (Tr. 448).

On April 9, 2010, plaintiff was seen at Associates in Pulmonary and Sleep Medicine, Inc. by Manojpal Dahuja, M.D. for complaints of long-standing daytime sleepiness and sleep apnea. (Tr. 712). She reported taking at least two naps per day. (Id.) She reported that she walked for one-half to one mile nearly every day. (Id.) She continued to smoke cigarettes. (Id.) She was diagnosed with mild sleep apnea, it was opined that her opiate and other sedative medications were the cause of her daytime sleepiness, and it was also noted that her sleep habits were irregular. (Tr. 713). She was instructed on the basics of good sleep hygiene. (Id.)

On April 12, 2010, plaintiff saw Farhat Shereen, M.D. for complaints of pain in her fingers. (Tr. 735). She denied change in sleep/wake pattern, weight gain, and weight loss. (Tr. 737). She had no cervical spine tenderness, and no joint deformity, heat, swelling, erythema or effusion and full range of motion in her bilateral shoulders, elbows, feet, and ankles. (Tr. 738). She had crepitus in her knees but full range of motion in her left knee. (Id.) she had mild pain with motion of her cervical spine. (Id.) She had no unusual anxiety or evidence of depression, no motor weakness, and her extremities were normal. (Id.) Radiographs of plaintiff's hands, left foot, left ankle were unremarkable. (Tr. 740-42). Radiographs of plaintiff's left foot revealed an old

healed fracture with orthopedic fixation.  (Tr. 743).  Radiographs
of plaintiff's right ankle revealed mild osteoarthritic changes.
(Tr. 745).

On May 13, 2010, plaintiff returned to Dr. Shereen for
complaints of bilateral knee pain and fibromyalgia syndrome.  (Tr.
731).  Plaintiff reported that she was taking Cymbalta with no side
effects.  (Id.)  She complained of chronic fatigue.  (Id.)
Musculoskeletal examination revealed no joint deformity, heat,
swelling, erythema, or effusion and full range of motion in
plaintiff's bilateral shoulders, hands, hips, feet and ankle, and
in her left elbow.  (Id.)  There were mild findings in plaintiff's
left knee, and she had restricted range of motion.  (Tr. 732-33).
She was diagnosed with arthritis of the knees, and injection was
performed.  (Tr. 733).  Dr. Shereen opined that plaintiff was not
a good candidate for NSAID drugs and combination narcotics, and
recommended that plaintiff use acetaminophen (Tylenol) for her knee
symptoms, and also recommended that plaintiff undergo physical and
occupational therapy.  (Id.)  Based upon lab work and plaintiff's
reports of tiredness, Dr. Shereen recommended plaintiff take
Vitamin D.  (Id.)

On June 2, 2010, plaintiff saw Dr. Quadri and reported
that she had a seizure the preceding week.  (Tr. 751).  She
complained of excessive daytime sleepiness, and Dr. Quadri
discussed adding Provigil and reducing Lunesta.  (Id.)  Plaintiff
then reported that she was compliant with medications and denied
side effects.  (Id.)  She denied feeling sad, depressed or anxious,

- 22 -

reported mood swings, denied suicidal thoughts, and had good
insight and judgment. (Id.) Dr. Quadri's diagnoses were bipolar
disorder, borderline personality disorder, fibromyalgia, cancer of
the spine in remission, COPD, asthma, hypothyroidism, borderline
diabetes, hypertension, stomach ulcers, and seizure disorder. (Tr.
751). It is noted that Dr. Quadri advised plaintiff to call with
questions or side effects. (Id.) He provided dietary and exercise
counseling to minimize plaintiff's risk for diabetes. (Id.) He
adjusted plaintiff's medications. (Id.)

On June 17, 2010, plaintiff returned to Dr. Dahuja and
complained of significant daytime sleepiness but also complained of
trouble falling asleep at night, and it was thought that "some of
the daytime sleepiness is due to some of her psychiatric
medications." (Tr. 711). She continued to smoke cigarettes
despite being advised to stop. (Id.) She was diagnosed with mild
sleep apnea. (Id.)

Plaintiff returned to Dr. Quadri on June 30, 2010 and
advised that Provigil had not been approved by Medicaid. (Tr.
752). She reported feeling nervous and anxious, particularly
around people, and that this "comes and goes." (Id.) She reported
that she had been in school and around strangers, which made this
worse. (Id.) She reported feeling depressed and crabby, but
denied suicidal thoughts. (Id.) She reported that her
relationship with a boyfriend was going well, and denied anhedonia.
(Tr. 752). Upon examination, Dr. Quadri noted that plaintiff
presented casually dressed, polite, calm and cooperative with good

eye contact.  (Id.)  He noted that plaintiff's affect was depressed with no lability.  (Id.)  She had no psychomotor abnormalities, she had logical and goal directed responses, and she denied suicidal thoughts.   She had good insight and judgment, she was alert and oriented times 3 and had clear sensorium.  (Tr. 752).  Dr. Quadri's diagnoses were unchanged.  (Id.)  He prescribed Zoloft,[11] Lunesta, Cymbalta,[12] Depakote, and Abilify.  (Id.)

On July 7, 2010, Dr. Quadri completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) form. (Tr. 746-47).  Dr. Quadri opined that plaintiff had a fair ability to function independently and maintain attention/concentration, but had poor to no ability to make all other occupational adjustments. (Tr. 746).  Dr. Quadri opined that plaintiff had a fair ability to understand, remember and carry out simple instructions, but had poor to no ability to make all other performance adjustments. (Id.)  Dr. Quadri opined that plaintiff had fair ability to maintain her personal appearance and demonstrate reliability, but poor to no ability to make all other personal-social adjustments. (Tr. 747).  He opined that plaintiff could manage benefits in her own best interests.  (Id.)

On December 7, 2010, plaintiff returned to Dr. Quadri and

---

[11]Zoloft, or Sertraline, is used to treat depression, anxiety, and other psychological disturbances. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697048.html

[12]Cymbalta, or Duloxetine, is used to treat depression, anxiety, and pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html

reported that she was unable to keep her sleep mask on her face.
(Tr. 1459).  She reported continued irritability, and Dr. Quadri
wrote that plaintiff reported that her daytime sleepiness was
"excessive without Focalin[13] but with it she is alert enough and can
function." (Id.)  She reported significant improvement in energy
level, focus, concentration, and reading comprehension.  (Id.)
Upon examination, plaintiff was calm and cooperative with good eye
contact.  (Id.)  She had no psychomotor abnormalities, she gave
logical and goal directed responses, and she denied suicidal
ideation and hallucinations. (Tr. 1459). She had good insight and
judgment, she was alert and oriented, and she had clear sensorium.
(Id.)  Dr. Quadri diagnosed plaintiff with bipolar disorder,
borderline personality disorder, fibromyalgia, cancer of the spine
in remission, COPd, asthma, hypothyroidism, borderline diabetes
type II, hypertension, stomach ulcers, seizure disorder, and
obstructive sleep apnea.  (Id.)  Dr. Quadri provided dietary and
exercise counseling, and it was noted that he counseled plaintiff
regarding medication side effects such as sedation and told
plaintiff to call if she had medication side effects.  (Id.)

On January 4, 2011, plaintiff returned to Dr. Quadri and
reported that she had started a new semester, was getting good
grades, and needed a letter from him so that she could continue to
receive prescriptions for narcotic pain medications.  (Tr. 1457).

---

[13]Focalin (Dexmethylphenidate) is a central nervous system
stimulant used to control symptoms associated with attention
deficit disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603014.html

Dr. Quadri wrote that he would not approve of her being on opioids
long term and that other alternatives should be considered because
of possible counteractions with plaintiff's other medications, the
presence of sleep apnea, and the associated risk of respiratory
depression.  (Id.)  Dr. Quadri also noted that plaintiff was at
high risk for dependence.  (Id.)  Dr. Quadri's diagnoses and plan
were unchanged from his record of plaintiff's December 7, 2010
visit.  (Id.)

### III.  The ALJ's Decision

The ALJ in this case determined that, while plaintiff
worked after October 23, 2008, her average monthly wages did not
exceed the substantial gainful activity threshold.  (Tr. 19).  He
determined that plaintiff had the severe impairments of
degenerative disc and joint disease, obstructive sleep apnea,
affective disorder, and obesity, but that her condition had neither
met nor medically equaled a listed impairment.  (Tr. 19-20).  The
ALJ determined that plaintiff retained the residual functional
capacity (also "RFC") to perform light work, with several
additional limitations.  (Tr. 20-21).  The ALJ determined that
plaintiff could not perform her past relevant work, considered
vocational expert testimony in determining whether a successful
adjustment to other work could be made, and ultimately concluded
that plaintiff had not been disabled in accordance with the Act.
(Tr. 23-24).

### IV.   Discussion

To be eligible for Disability Insurance Benefits and

Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382(a)(3)(b).

        To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520 and 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether the claimant's impairment(s)

meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to a listed impairment, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.

        The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  The "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).

        If substantial evidence exists to support the administrative decision, this Court must affirm that decision even if the record also supports an opposite decision.  Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003); see also Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir.

2000) (In the event that two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole).

    A.   <u>Credibility Assessment</u>

Plaintiff contends that the ALJ erred in assessing her credibility.  In support, plaintiff alleges that the ALJ summarily determined that she lacked credibility due to her statements regarding shopping and driving.  Plaintiff also broadly states that the ALJ failed to sufficiently address each of the factors outlined in <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir. 1984) and its progeny.  Finally, plaintiff argues that the ALJ failed to properly consider her complaints that her medications caused daytime sleepiness.  Review of the ALJ's decision reveals no error.

Before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints.  <u>Wagner v. Astrue</u>, 499 F.3d 842, 851 (8th Cir. 2007) (citing <u>Pearsall</u>, 274 F.3d at 1217).  The Commissioner's Regulations, and Eighth Circuit precedent, require an ALJ to consider the following factors when evaluating a claimant's subjective complaints: the claimant's prior work record, observations by third parties and treating and examining physicians relating to such matters as the claimant's daily activities, the duration, frequency and intensity of the symptoms, precipitating and aggravating factors, dosage, effectiveness and side effects of medication, and functional restrictions.  20 C.F.R. §§ 404.1529 and 416.929; <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir.

1984).  An ALJ may consider the absence of objective medical evidence to support the complaints, but may not rely solely upon this factor to discredit the claimant.  See Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) (citing Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008)).

While an ALJ is not required to explicitly discuss each of the foregoing factors, Goff v. Barnhart, 412 F.3d 785, 791 (8th Cir. 2005), the ALJ is required to acknowledge and consider the foregoing factors and make an express credibility determination that explains the reasons for discrediting the claimant's complaints.  Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012) (citing Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011)).

Plaintiff's suggestion that the ALJ summarily stated that she lacked credibility is wholly meritless, as is plaintiff's broad statement that the ALJ failed to sufficiently address the Polaski factors.  The ALJ in this case wrote that he had considered plaintiff's symptoms and the extent to which they could reasonably be accepted as consistent with the objective and other evidence in accordance with 20 C.F.R. §§ 404.1529 and 416.929, and SSRs 96-4p and 96-7p, the Regulations and Social Security Rulings that correspond with Polaski and credibility determination.  The ALJ then noted numerous inconsistencies in the record that detracted from plaintiff's credibility.

The ALJ first identified objective medical evidence that detracted from the credibility of plaintiff's allegations of symptoms precluding all work.  While an ALJ may not discount a

claimant's subjective complaints based solely upon a lack of supporting medical evidence, the lack of such evidence is one factor an ALJ may consider in analyzing a claimant's credibility. See Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).

The ALJ discussed plaintiff's medical treatment, noting her complaints and diagnoses. As the ALJ noted, most of the testing yielded fairly benign results, and most of the physical and psychiatric examinations yielded fairly normal findings. As the ALJ noted, MRI imaging of plaintiff's cervical and thoracic spine showed only mild degeneration and, while the thoracic spine imaging showed disc protrusion, it did not show stenosis. As the ALJ noted, lumbar MRI performed in June 2009 showed only moderate degeneration, 2008 knee imaging was largely normal, and April 2010 imaging of plaintiff's right ankle was unremarkable except for mild arthritis. The ALJ also noted that medical examinations performed during late 2008 to early 2010 had either normal or rather insignificant musculoskeletal and neurological results. The ALJ noted that physical examination revealed effusion, limited range of motion, tenderness and muscle spasm on only one to two occasions each, and that physical examination mostly yielded normal findings. The ALJ also noted that mental status evaluations conducted during October 2008 to April 2009 yielded normal results. While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ was entitled to consider the fact

that the objective medical evidence did not support the degree of alleged limitations.  20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); Kisling v. Chater, 105 F.3d 1255, 1257-58 (8th Cir. 1997); Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989) (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered).

Continuing with his credibility assessment, the ALJ noted that evidence in the record that plaintiff drove a vehicle was inconsistent with her assertions of an inability to sit more than 15 to 20 minutes at a time, and that evidence that she shopped was inconsistent with her assertions of an inability to stand for a prolonged period.  Also notable is plaintiff's March 2010 statement that she walked for 20 minutes each day, (Tr. 460), and her April 2010 statement that she walked one-half to one mile daily.  (Tr. 712).  Also, despite plaintiff's testimony that she suffered from debilitating symptoms, her treatment providers consistently advised her to engage in regular exercise.  Contrary to plaintiff's assertions, the ALJ was entitled to consider this evidence in evaluating plaintiff's credibility.  See Medhaug v. Astrue, 578 F.3d 805, 816 (8th Cir. 2009) (activities such as driving, shopping, walking, cooking, and household chores are inconsistent with complaints of disabling pain); Forte, 377 F.3d 896 (activities such as driving, walking for exercise, shopping, and attending classes were among those considered inconsistent with the claimant's allegations of disabling symptoms).

The ALJ also noted plaintiff's report that she had

- 32 -

experienced neck and back pain since 2001, and that plaintiff's medical records failed to demonstrate a significant deterioration since that time. As the ALJ noted, a condition that was present but not disabling during working years cannot be used to prove a present disability, absent evidence of significant deterioration. Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (per curiam). The ALJ also noted that only conservative spinal treatment had been offered to plaintiff. See Moore v. Astrue, 572 F.3d 520, 525 (8th Cir. 2009) (conservative treatment during period of alleged disability inconsistent with complaints of disabling pain).

The ALJ noted that the record reflected a lack of psychiatric care from May 2009 to February 2010. See Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)(while not dispositive, the failure to seek treatment may indicate "the relative seriousness of a medical problem"); see also Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995) (the lack of regular and sustained treatment is a basis for discounting complaints and is an indication that the claimant's impairments are non-severe and not significantly limiting for twelve continuous months). The ALJ also noted that, despite plaintiff's testimony that she experienced suicidal thoughts, she consistently denied such thoughts when questioned by her treating sources. Also notable is that, when seeking other treatment, plaintiff did not consistently complain of the same spinal and psychiatric symptoms she now alleges are disabling. When plaintiff reported for counseling in January of 2009, she reported doing ok psychologically and was working. (Tr. 1205). In

April of 2009, she reported that she was happy, newly married, and working at Ryan's.  (Tr. 1206).  When plaintiff saw Dr. Lynskey in November of 2009, she reported that she had not had psychiatric care, she had no anxiety, and had a normal examination.  (Tr. 481, 483).  In April of 2010, Dr. Shereen noted no evidence of anxiety or depression.  (Tr. 738).  Also, as is evident from the above summary of the medical information, when plaintiff sought medical treatment, she did not routinely report the same musculoskeletal complaints she now alleges render her totally disabled.  In evaluating subjective complaints, an ALJ may consider that the claimant did not exhibit complaints regarding an alleged impairment while receiving other treatment.  Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam).

The ALJ also noted evidence in the record that plaintiff sometimes stopped taking her psychiatric medications.  Later in his decision, the ALJ noted that plaintiff did not use the BIPAP as directed.  The record also indicates that plaintiff continued to smoke cigarettes despite being repeatedly told to stop, even when she was told that smoking was aggravating her sleep issues.  Plaintiff does not contend that her failure to comply with treatment was justified by a good reason, and review of the record reveals none.  "A failure to follow a recommended course of treatment ... weighs against a claimant's credibility."  Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005).

The ALJ also observed that plaintiff was recently convicted of forgery.  See Simmons v. Massanari, 264 F.3d 751, 756

(8th Cir. 2001) (upholding negative credibility finding based on conflicting statements and forgery conviction); see also Federal Rule of Evidence 609 (Impeachment by evidence of a criminal conviction).   The ALJ also observed that plaintiff's poor work history reflected a poor work ethic.  A poor work history detracts from a claimant's credibility.  Pearsall, 274 F.3d at 1218 (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993)).  Also notable is the fact that plaintiff told Dr. Quadri in 2010 that her medical history included "cancer of the spine." (Tr. 749).  There is no medical evidence to support this report.   While plaintiff did undergo surgery in 2008 to remove a mass, testing revealed the mass was benign, and plaintiff's post-operative diagnosis was listed as simple lymphatic cyst.  (Tr. 895).  Exaggerated responses during medical examination are one factor that can weigh against a claimant's credibility.  Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004).

Plaintiff argues that the ALJ erroneously analyzed her daytime sleepiness as if it arose from sleep apnea when in fact it arose from side effects of medications.   Citing the ALJ's observation that plaintiff had an excellent response to BIPAP use, plaintiff argues that even if her sleep apnea resolved, she would continue to suffer daytime sleepiness due to her medications. Contrary to plaintiff's argument, the ALJ acknowledged plaintiff's allegation that her daytime sleepiness was a side effect of medication.  (Tr. 23).  The ALJ went on to note evidence from the record suggesting that plaintiff's symptoms were self-inflicted;

namely, her failure to use the BIPAP and take psychiatric medication as directed.  As noted above, failure to follow a prescribed course of treatment weighs against a claimant's credibility.  <u>Guilliams</u>, 393 F.3d at 802.

The administrative record as a whole supports the ALJ's conclusion regarding plaintiff's allegations of daytime sleepiness. When plaintiff presented to Barnes-Jewish St. Peters Hospital for a sleep study in February of 2010, she described her sleep habits, stating that she went to bed between midnight and 2:00 a.m., and got up several times at night to consume snacks and drinks.  In March and April of 2010, Drs. Lynskey and Dahuja, respectively, described plaintiff's sleep habits as irregular and erratic, and instructed her to improve her sleep hygiene.  Sleep habits such as these would alone likely cause a person to be sleepy during the day, and it would seem that a person who was truly motivated to improve her daytime functioning would choose to observe a healthier sleep schedule.

In addition, when she presented for the February 2010 sleep study, plaintiff reported that she had been symptomatic for the past seven to eight years.  A condition that was present but not disabling during working years and has not worsened cannot be used to prove a present disability.  <u>Orrick v. Sullivan</u>, 966 F.2d 368, 370 (8th Cir. 1992) (<u>per</u> <u>curiam</u>); <u>Dixon v. Sullivan</u>, 905 F.2d 237, 238 (8th Cir. 1990).  Finally, the record contains evidence that plaintiff's daytime sleepiness was controlled by medication. On December 7, 2010, plaintiff saw Dr. Quadri.  The progress note

from this visit was submitted to and considered by the Appeals Council, and made part of the administrative record.  On that date, Dr. Quadri wrote that plaintiff reported that her daytime sleepiness was "excessive without Focalin but with it she is alert enough and can function." (Tr. 1459).  While not alone dispositive of the issue, this is some evidence that supports the ALJ's decision.  See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir.2007) (an impairment that can be controlled by medication cannot be considered disabling).  Finally, plaintiff's subjective complaints of daytime sleepiness were subject to review in light of her credibility as a whole, and the ALJ properly discredited plaintiff after undertaking a legally sufficient analysis.

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by Polaski, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from plaintiff's credibility.  An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles, 902 F.2d at 660.  Because the ALJ considered the appropriate factors and gave good reasons for discrediting plaintiff's subjective complaints, his credibility determination will be upheld.  Hogan, 239 F.3d at 962.

B.  Dr. Quadri's Opinion

In reaching his conclusions regarding plaintiff's RFC, the ALJ wrote that he was giving Dr. Quadri's July 2010 opinion only slight weight, offering several valid reasons for doing so.

Plaintiff alleges that the ALJ erred in determining plaintiff's RFC in that he failed to recognize Dr. Quadri's status as a treating psychiatrist, and failed to properly weigh his opinion.  Plaintiff also contends that the ALJ should have included the limitations Dr. Quadri assessed in finding plaintiff's RFC.  Review of the ALJ's decision reveals no error.

A treating physician's opinion is generally entitled to substantial weight, but it does not automatically control, because the ALJ must evaluate the record as a whole.  Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (citing Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004)).  According to the Regulations and to Eighth Circuit precedent, a treating physician's opinion must be well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it must not be inconsistent with the other substantial evidence in the record.  20 C.F.R. §§ 404.1527, 416.927; Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  "If the opinion fails to meet these criteria, however, the ALJ need not accept it."  Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) (internal citation omitted); see also Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) (If justified by substantial evidence in the record as a whole, the ALJ can discount a treating physician's opinion).  When an ALJ discounts a treating physician's opinion, he should give "good reasons" for doing so.  Davidson, 501 F.3d at 990 (citing Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002)).

Plaintiff's suggestion that the ALJ failed to recognize

Dr. Quadri's status as a treating psychiatrist is unfounded. During the time preceding Dr. Quadri's July 2010 opinion, plaintiff saw him on only three occasions.  In his decision, the ALJ discussed the treatment records generated during those three visits, and then discussed Dr. Quadri's opinion.  The ALJ also wrote that he had considered opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927, and SSRs 96-2p, 96-5p, 96-6p, and 06-3p which address, inter alia, weighing opinion evidence from treating sources.  (Tr. 21).  The ALJ explained how he reached his decision to give Dr. Quadri's opinion evidence slight weight, offering valid reasons in support.

As the ALJ determined, Dr. Quadri's opinion evidence was inconsistent with his own treatment notes.  When Dr. Quadri first examined plaintiff, he noted that she was sad, depressed and anxious, but had good eye contact, logical and goal-directed responses, a clear sensorium, good insight and judgment, no suicidal thoughts, and no thought disorder, and he assessed plaintiff's GAF as 65, indicative of only mild symptoms.  When plaintiff saw him next, she denied feeling sad, depressed or anxious, and Dr. Quadri found that her mood was good and her affect was euthymic.  When plaintiff saw him next, she complained mostly of feeling anxious when around others, such as when she attended school.  While Dr. Quadri documented a depressed affect with no lability, the remainder of the examination was normal.  Dr. Quadri's treatment records generated after his opinion evidence are similarly unsupportive: on December 7, 2010 he documented no

abnormalities during mental status examination, and his findings in January of 2011, when denying plaintiff's request for assistance in continuing to receive narcotic pain medication, were similarly normal.  Despite plaintiff's suggestion to the contrary, the ALJ did not form his own medical opinion when he observed that Dr. Quadri's only abnormal findings were relatively insignificant, nor did the ALJ ignore any positive findings.  Review of the ALJ's decision reveals that he exhaustively analyzed all of the medical and other evidence of record, and it does not appear that the ALJ overlooked any evidence.  While Dr. Quadri did, as plaintiff argues, note some positive findings upon examination, the ALJ was justified in concluding that such findings failed to justify the extreme limitations expressed in the opinion evidence.  An ALJ is entitled to discount a treating physician's opinion that is inconsistent with his treatment notes.  <u>Davidson</u>, 578 F.3d at 842 ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes").

Dr. Quadri's opinion evidence did not include a narrative or any explanation of plaintiff's symptoms, clinical signs, or what diagnostic techniques were used to arrive at the indicated conclusions.  A treating physician's opinion is accorded controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  It therefore appears

that Dr. Quadri's opinion evidence was based largely on plaintiff's subjective allegations, which the ALJ properly discredited after undertaking a legally sufficient analysis.   An ALJ may discount an opinion that is based largely on a claimant's subjective complaints rather than objective medical evidence.   Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007).   This is especially so given evidence in the record that plaintiff exaggerated her complaints to Dr. Quadri, inasmuch as she told him she had cancer of the spine when in reality she had a benign mass removed.

Also, as the ALJ observed, Dr. Quadri's opinion evidence was inconsistent with plaintiff's reported ability to attend school, and with the balance of the medical information of record. As noted above, plaintiff reported in January of 2009 that she was doing ok psychologically and was working. (Tr. 1205).   In April of 2009, she reported that she was happy, newly married, and working at Ryan's, (Tr. 1206), and when she saw Dr. Lynskey in November of 2009, she reported that she had not had psychiatric care, she had no anxiety, and had a normal examination.   (Tr. 481, 483).   In April of 2010, Dr. Shereen noted no evidence of anxiety or depression.   (Tr. 738).   An ALJ is not obligated to give controlling weight to an opinion that is inconsistent with the other substantial evidence in the record.   Davidson, 578 F.3d at 842; see also Ward, 786 F.2d at 846 (If justified by substantial evidence in the record as a whole, the ALJ can discount a treating physician's opinion).

Plaintiff argues that the ALJ erroneously failed to

- 41 -

include in his analysis of plaintiff's RFC the additional limitations described in Dr. Quadri's July 7, 2010 medical assessment and in plaintiff's testimony. However, for the reasons discussed, <u>supra</u>, the ALJ in this case properly discredited plaintiff's subjective allegations of pain and other limitations precluding all work, and properly discounted Dr. Quadri's opinion evidence. He was therefore not obligated to include such limitations in his analysis of plaintiff's RFC. Plaintiff bears the burden of persuasion to prove disability and demonstrate her RFC. <u>Vossen v. Astrue</u>, 612 F.3d 1011, 1016 (8th Cir. 2010). Plaintiff herein cannot demonstrate that her functional limitations are greater than those described in the ALJ's RFC assessment. An RFC assessment draws from medical sources for support, but RFC is ultimately an administrative decision reserved to the Commissioner. <u>Cox v. Astrue</u>, 495 F.3d 614, 619 (8th Cir. 2007) (citations omitted).

The specific grounds identified by plaintiff fail to support remand. For all of the foregoing reasons, on the claims that plaintiff raises, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole, and should therefore be affirmed. Because there is substantial evidence to support the decision, reversal is not required merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir.2001); <u>Browning</u>, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.


_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of October, 2013.